Rel: December 8, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

_____

## CL-2023-0202

_____

**Stephanie Wingfield**

**v.**

**City of Dothan and City of Dothan Personnel Board**

**Appeal from Houston Circuit Court**
**(CV-22-58)**

FRIDY, Judge.

Stephanie Wingfield appeals from a judgment of the Houston Circuit Court ("the circuit court") upholding a decision of the City of Dothan Personnel Board ("the board") to terminate her employment with the City of Dothan ("the city"). For the reasons discussed herein, we reverse the judgment.

## Background

Wingfield served as a recreation-program coordinator in the city's Department of Leisure Services ("leisure services"). In that job, Wingfield was responsible for the management of the food programs that leisure services operated, including the Child and Adult Care Food Program. According to the disciplinary-action form that initiated the proceedings against Wingfield, on May 16, 2022, the city received a complaint regarding the bid process for the award of the city's summer feeding program, which provided meals to underprivileged children. Although Wingfield, who supervised the summer feeding program, was not involved in the bid process, the complaint led leisure services and the city's Department of Finance ("finance") to investigate the management and operation of the program.

After the investigation, leisure services and finance determined that Wingfield had engaged in negligent and willfully improper conduct, including providing incorrect information and untimely submitting paperwork to the employees under her supervision, which prevented them from adhering to the rules and regulations governing the feeding program. The disciplinary-action form stated that the incorrect

information was knowingly used for submission of incorrect reports to the State of Alabama for monetary reimbursement. The form also stated that Wingfield had engaged in the knowing and deliberate submission of forms indicating the monthly meal and snack totals to the state for reimbursement without true and accurate supporting documentation and that she had made false statements to her supervisors, city commissioners, and the city manager that the food program was being operated according to its rules. The form stated that Wingfield had allowed employees under her supervision to fail to adhere to required "custody control" measures repeatedly, had failed to hold employees accountable for their noncompliance with program rules, and had failed to provide the required management and operational oversight of the city's food programs.

Leisure services and finance claimed that Wingfield had committed two "major offenses" that could cause financial loss to the city and that she had acted negligently in carrying out her assigned duties and responsibilities. The departments also claimed that she had committed two "intolerable offenses" based on what they said was the deliberate falsification of records and/or personal misrepresentation of statements

3

made to her supervisor, officials, the public, or relevant city boards. No criminal charges were levied against Wingfield; instead, the alleged violations cited were administrative in nature.

On June 17, 2022, Wingfield was served with notice of a determination hearing and possible disciplinary action. On June 21, 2022, a determination hearing was held before a hearing officer, at which time Wingfield was given the opportunity to respond to the violations set forth in the disciplinary-action form. The next day, June 22, 2022, Wingfield received a written decision from the hearing officer finding that she had committed the violations as specified, and her employment was immediately terminated. Wingfield appealed the hearing officer's decision to the board, which held an evidentiary hearing on July 27, 2022.

During the hearing, the city's finance director, Romona Marcus, testified that leisure services had a contract pursuant to which a business called Breakfast at Tammie's ("Tammie's") was to prepare meals and snacks for the city's "At-Risk Afterschool Program" ("the after-school food program"). Alison Hall, the director of leisure services, testified that Wingfield was responsible for the management and operation of that

program. She said that Wingfield received training from the State Department of Education on operating the program.

Under the after-school food program, Marcus said, the city delivered Tammie's meals to city-owned distribution centers where site supervisors would accept them. The meals were distributed to children and teens who qualified or who lived in neighborhoods that qualified for free or reduced-priced lunches in the school system.

Marcus testified that the United States Department of Agriculture provided the funding for the after-school food program, passing money down to the states, which, in turn, passed the money to the organizations that ran after-school programs. To operate its program, Marcus said, the city received $2.1 million in 2021 and $1.1 million for part of 2022. In 2021, Marcus said, Tammie's billed leisure services $1.5 million for 370,000 meals.

Marcus explained that Tammie's billed leisure services monthly for the meals it had prepared the previous month. Wingfield, as manager of the after-school food program, was responsible for deciding how many meals to order and for ordering those meals. Marcus and Hall testified that Wingfield certified the invoices from Tammie's. Hall said that, as a

department head, she was required to sign the invoices before the state could reimburse the city for the cost of the meals. She said that she signed the invoices based on Wingfield's certification that they were correct.

Marcus testified that she participated in a review and examination of the management of the after-school food program at the city manager's request. As part of her investigation, Marcus said, she interviewed site supervisors and city employees about the information contained in the various records that the program kept regarding the number of meals ordered, delivered, and served, how and when those records were completed, and who instructed them about how to keep the records. She acknowledged that "a lot of the information" to which she testified was what other people had told her and that she did not have any direct experience working in the food programs.

At the hearing before the board, Marcus was shown a March 1, 2022, invoice from Tammie's, billing leisure services $34,580 for 38,200 snacks provided during February 2022. The invoice included a breakdown showing which of seven distribution centers received the snacks. Marcus said that the city did not own two of those centers and that city employees did not work at those centers. Marcus said that she

reviewed the March 2022 invoice for snacks and determined that about 27,400 of the snacks -- about 65% -- did not go where the invoice indicated. A separate invoice indicated that the same number of meals (as opposed to snacks) were also prepared that month. Tammie's billed the leisure services $127,680 for the February meals. Marcus said that she looked at invoices for other months and found that they also did not correctly reflect where the meals and snacks were taken. Marcus estimated that the city was paying approximately $105,000 per month for meals and snacks that did not go where the invoices indicated. Marcus said that the other documents reflecting the after-school food program's operations in February 2022 that were explained at the hearing before the board were representative of the documents she examined for other months, as well.

Marcus testified that the city would pay the bills from Tammie's and then the city would bill the state for the number of meals served. The forms the city used to request the reimbursement indicated which sites served the meals. She said that Wingfield prepared the reimbursement requests, which reflected that the meals were served at the same sites shown on the invoices from Tammie's. She further testified that the

reimbursement documents she reviewed showed that all the meals went to the sites; however, she added, only about 35% of the meals actually went to those sites. Marcus noted that the records for the two distribution sites that the city did not own were correct.

Marcus said that when the COVID-19 pandemic began in March 2020, children could not come to the city's distribution sites to get meals, but, she said, the city was permitted to deliver meals to the children on routes in specific neighborhoods. She explained that city employees operated two vans that would pick up the meals from Tammie's and deliver them to children along the neighborhood routes. Tammie's also operated a van, she said. The drivers were supposed to keep records, Marcus said, but they did not. Marcus testified that the records that were turned in were not correct and that the people who were to keep the records along the routes "all stated that Ms. Wingfield told them how" to complete the forms they were to fill out daily.

Marcus testified that, like the route drivers, site supervisors were supposed to keep daily records of the meals they received. Marcus said that she talked with site supervisors who told her they did not keep up with the forms daily and, instead, completed the forms the way Wingfield

told them to. For example, Marcus said, the supervisor at one site told her that the daily forms were normally not filled in until mid- to late month, when, Marcus said, the supervisor learned from Wingfield what numbers she was to use to fill in for the number of meals delivered.

Marcus testified that, according to her interview with a supervisor from one of the sites, the same method was used for the monthly reports the site supervisors were to complete. For example, the monthly report for February 2022 indicates that 8,797 meals were delivered to a specific site. Marcus said that she determined that the actual number of meals delivered to that site was 1,900. Marcus testified that the supervisor for that site told her that Wingfield would provide the site supervisor with the numbers she was to record on the monthly forms.

All meal-distribution sites were required to complete a daily record form showing the name of the person who received each meal. Marcus said that Wingfield put the names on the forms provided to the distribution sites. An "X" was placed by the name if that person was served, and an "A" was placed by the name if the person was absent. At the same site she had previously discussed, Marcus said, the forms were not filled out daily. There were 100 children served at that site, Marcus

said, and the form for February 2022 indicated, that meals were served for nineteen days, for a total of 1,900 meals. However, the invoice for that month indicated that the city was billed for 8,797 meals for that site. Marcus said that the supervisor at that particular site told her that she was not able to complete the forms daily because she did not receive the forms in time to do so. The supervisor told Marcus that she would receive the forms with the names of who was to receive a meal mid- to late month, and that Wingfield gave her those forms. When the supervisor received the forms, the children's names were already on it, but the names were not necessarily of the same children who had received the meals.

When the after-school food program was operating during the COVID-19 pandemic, Marcus said, the city employees who delivered the meals along the neighborhood routes were to complete the same types of daily forms showing the names of the children who received meals on their routes. However, Marcus said, those employees also received their forms late and the names of children were already filled in. The people handing out the meals on the routes did not know who was receiving the meals, but on Wingfield's instructions, they would put "X"s by a number of names equal to the number of meals that Wingfield told them to enter

on the forms. Marcus said that she determined that there would be meals left over and that the route drivers told her that, on Wingfield's instructions, they did not return those meals to Tammie's. Marcus said that the drivers told her they would either drive an alternate route to hand out the remaining meals, take the meals home for themselves, or sometimes throw away the meals. Marcus said that, during the pandemic, the two meal-distribution centers that city employees did not operate did not distribute any of their meals using the neighborhood routes.

In addition to the discrepancies already described, Marcus said that the documents she reviewed indicated that meals were claimed for the same children at different sites. Absences reported for the children at the sites did not match the absences for the children on the meal records, she said, and the number of daily absences at the sites and for the meals did not match. Marcus said that there were also meals and snacks that were claimed on lines on the forms where no children's names were listed. She said that one of the site supervisors reported that she had told Wingfield that too many meals were being delivered to her site but that Wingfield

did not subsequently modify the number of meals that were being sent to that site.

No testimony was presented regarding a possible reason for why Wingfield provided incorrect figures and information for the after-school food program records. For example, there was no evidence that Wingfield was receiving any type of personal gain as a result of the incorrect records. While Wingfield's attorney was cross-examining Marcus regarding the information in the records, the attorney for the city advised the board that a motive for Wingfield's actions had not been discerned and to attribute a motive to her would be based on speculation.

Marcus testified that Wingfield's mismanagement of the after-school food program was required to be disclosed in the city's annual audit, which would likely result in the city's being listed as a "high-risk auditee" in its comprehensive annual financial report. That report is sent to every agency that supplies the city with federal money and grants, not just the agency that provides money for the after-school food program. Marcus said that Wingfield's mismanagement had "a potential to affect federal funding citywide for several years." She also said that, because the records for the after-school food program were not accurate, there was

12

a potential that the city would have to repay the state a portion of the money the city received to operate the program.

Marcus reported her findings to Hall, who confirmed them with the city employees who were involved with the after-school food program. Hall said that the grounds for her decision to terminate Wingfield's employment included Wingfield's incorrect completion of the paperwork that the program required, her failure to adequately train the employees that participated in the program, and her failure to provide them with what they needed to complete their tasks.

Wingfield did not testify before the board, nor did she present any witnesses on her behalf. Her personnel record was admitted into evidence at the hearing.

On August 31, 2022, the board voted unanimously to uphold the decision to terminate Wingfield's employment. Wingfield appealed to the circuit court. On October 24, 2022, the circuit court entered an order stating that, in accordance with § 45-35A-51.32, Ala. Code 1975, its review of the board's order would not be de novo; rather, the circuit court stated that it would review the board's order based on the evidence contained in the transcript of the board's proceedings. The circuit court

13

called on the parties to brief whether the appeal to the circuit court was proper and timely, whether there was sufficient legal evidence, i.e., substantial legal evidence, to support the board's order, and whether the board's order was unlawful and unreasonable.

On November 7, 2022, Wingfield filed what she said was a "motion to alter, amend, or vacate" the "judgment" of October 24, 2022, in which she asserted that the board's order upholding the decision to terminate her employment should receive de novo review in the circuit court. The circuit court denied that motion on November 7, 2022. The parties submitted their briefs to the circuit court, which held oral argument on February 21, 2023.

On March 3, 2023, the circuit court entered a judgment finding that the board's decision was supported by substantial legal evidence and that the city had "properly afforded due process" to Wingfield throughout the termination proceedings. Therefore, the circuit court concluded, the board's decision of August 31, 2022, upholding the city's decision to terminate Wingfield's employment was itself due to be affirmed. Wingfield appealed to this court on March 30, 2023.

Analysis

14

Wingfield raises four arguments on appeal, but one of those arguments is dispositive. Wingfield contends that the circuit court erred in finding that substantial evidence supported the board's decision to uphold the termination of her employment. She asserts that, if the hearsay testimony presented during the board's hearing is not considered, there was insufficient legal evidence to support the circuit court's judgment affirming the board's decision to uphold the termination of her employment. Wingfield specifically contends that the evidence of her alleged misconduct consisted of Marcus's and Hall's testimony as to what others had told them, which, she argues was hearsay. Wingfield asserts that Marcus and Hall had no personal knowledge of her alleged misconduct.

Section § 45-35A-51.32, part of the Civil Service Act of Dothan, § 45-35A-51 et seq., Ala. Code 1975, which governs judicial review of decisions of the board, provides that "[t]he findings of fact by the board, duly set forth in the transcript, if supported by substantial evidence adduced before the board, after notice to the interested party or parties and after affording such parties an opportunity to be heard, shall be conclusive on any appeal." Hearsay evidence of probative force may be

considered in an administrative hearing. Estes v. Board of Funeral Serv., 409 So. 2d 803 (Ala. 1982). "Nonetheless, there must be sufficient legal evidence to support the order of an administrative board. If founded only on hearsay or other improper evidence, the decision of a board cannot be sustained." Id. at 804. See also Alabama State Pers. Bd. v. Palmore, 277 So. 3d 977, 983 (Ala. Civ. App. 2018) (explaining that an administrative board may consider probative hearsay evidence, but the board's decision cannot be based solely on such evidence).

During his cross-examination of Marcus and Hall, Wingfield's attorney asked whether they had personal knowledge of the information to which they testified. Marcus, who worked in the finance department, testified that she had interviewed site supervisors, route drivers, and other employees to obtain information regarding how the after-school food program's records had been compiled, who instructed the employees on keeping those records, and other facts that had led to the charges against Wingfield. Hall testified that she had confirmed Marcus's findings through those employees. Thus, it appears from the record that the testimony that supported the city's termination of Wingfield's employment -- that she had knowingly used incorrect information in the

16

completion of forms required for the city to be reimbursed for meals and snacks purchased through the program, that she had provided the employees under her supervision with incorrect information, and that she had failed to provide them with the information and documents they needed to do their jobs properly -- was based solely on information that Marcus and Hall had learned from others.

In contrast, the only testimony Marcus and Hall gave that appears to have been based on their personal knowledge concerned the way the after-school food program was funded, Wingfield's duties and responsibilities, and the ramifications of the incorrect information contained in the records that the program required. None of that testimony demonstrated that Wingfield had engaged in any improper or wrongful conduct.

As for the documentary evidence the city submitted, we conclude that, without the explanations from the employees about the timeliness of their receipt of the forms they were to fill out, the way Wingfield instructed them to complete the forms, and how those forms were actually completed, none of those documents, on their faces, are sufficient to support the charges against Wingfield. Even if they were sufficient to

support the charges, those documents likewise constitute hearsay evidence, as they appear largely to be out-of-court recordings of information with no testimony offered to demonstrate their admissibility. See, e.g., Rule 803(6), Ala. R. Evid. (providing, as an exception to hearsay, records of regularly conducted business activity when those records reflect information made by a person with knowledge, kept in the course of regularly conducted business activity, and if it was the regular practice of the business activity to make such records).

The city argues that Wingfield did not object to Marcus's and Hall's testimony on the ground that their testimony constituted hearsay or was based on hearsay. In so arguing, the city misconstrues Wingfield's contention and the applicable law. As noted above, hearsay evidence is, in fact, admissible at a board hearing, and a board is permitted to consider such evidence in deciding an administrative matter before it. However, as Wingfield argues and as this court has previously stated, to sustain a board's determination, that determination must be based on sufficient legal evidence, not just evidence that is hearsay or is otherwise improper. See Estes, 409 So. 2d at 804. Thus, the error here is not that the board considered hearsay evidence, the error is that only evidence

18

supporting the board's determination was either hearsay or was based on hearsay.

In this respect, the board's reliance on Ex parte Williamson, 907 So. 2d 407 (Ala. 2004), is misplaced. In Williamson, the Alabama Department of Public Health sought to revoke the license of an assisted-living facility -- a process governed by the rules of evidence for contested cases, as set forth in § 41-22-13, Ala. Code 1975, part of the Alabama Administrative Procedure Act ("the AAPA"), § 41-22-1 et seq., Ala. Code 1975. Our supreme court held that, under § 41-22-13(1), "it is plain that the rules of evidence concerning the necessity for an objection to preserve error are applicable in this case." 907 So. 2d at 415. Unlike in Williamson, this case is governed by the Civil Service Act of Dothan, not the AAPA, and the Civil Service Act of Dothan does not contain a similar provision regarding the preservation of error and the consideration of hearsay testimony on judicial review of the board's decisions. Indeed, as noted above, the admission of hearsay evidence by the board did not constitute error. Rather, the board's decision was in error because it was based solely on hearsay evidence.

## Conclusion

19

Because the board's order is founded only on hearsay evidence, there is insufficient legal evidence to support the board's decision, and it cannot be sustained. Estes 409 So. 2d at 804. Therefore, the judgment of the circuit court is due to be reversed and the cause remanded for entry of a judgment consistent with this opinion.

REVERSED AND REMANDED.

Thompson, P.J., and Moore, Edwards, and Hanson, JJ., concur.